Grace M. NANNAY, etc., Plaintiff,

v.

ROWAN COLLEGE, et al., Defendants.

No. CIV. A. 98–3672.

United States District Court,
D. New Jersey.

June 30, 2000.

William C. Popjoy, III, Hoffman, Dimuzio, & Hoffman, Woodbury, NJ, for plaintiffs.

John J. Farmer, Jr., Attorney General of New Jersey by Joanne Stipick, Deputy Attorney General, Trenton, NJ, for State of New Jersey, Rowan College, Kevin Mannix, Pearl Bartelt, Frank Hogan, defendants.

Scott D. Samansky, Fishman & Callahan, P.C., East Hanover, NJ, for The Sports Authority, defendant.

William A. Riback, Camden, NJ, for Rene DeBosscher, Sarah Lonabaugh, Tammy Lonabaugh, Traci Lonabaugh, defendants.

## OPINION

RODRIGUEZ, District Judge.

This matter is before the Court on three separate motions for summary judgment. For the reasons that follow, the motion addressing the federal claims will be granted and the Court will decline to assert supplemental jurisdiction over any remaining claims.

### *JURISDICTION*

The Complaint alleges that this Court has jurisdiction over this matter because relief is requested pursuant to 42 U.S.C. § 1983, as it has been alleged that "the defendants violated several rights and immunities of Cindy Ann Nannay arising under the Constitution of the United States of America." (Complaint, p. 2, Statement of Jurisdiction.)

## FACTUAL BACKGROUND

This case was filed as the result of a murder-suicide which occurred on the campus of Rowan College, now Rowan University, in Glassboro, New Jersey on August 12, 1996.

On August 12, 1996, Cindy Ann Nannay was a twenty-two year old student at Rowan College in Glassboro, New Jersey, and was a volunteer announcer for the college radio station, WGLS. (Complaint, ¶¶ 1, 2; State Defendants' Statement of Material Facts, ¶ 4.) For approximately one year prior to August 12, 1996, Cindy Ann Nannay had been involved in a relationship with and had been sharing living accommodations with Scott Lonabaugh, age twenty-eight and not connected to Rowan College. (Complaint, ¶ 3; State Defendants' Statement of Material Facts, ¶ 5.) Their shared living accommodations were in Gloucester City, New Jersey and in Thorofare, New Jersey. (State Defendants' Statement of Material Facts, ¶ 11.) It is apparent that the relationship was an abusive one. (Complaint, ¶ 4.)

The record reflects that on or about December 19, 1995, Gloucester City Police were summoned to the home of Scott Lonabaugh as the result of a complaint that he was threatening children in the street with a weapon. (Complaint, ¶ 7; Gloucester City Police Department Investigation Report, attached as Exhibit C to Plaintiff's Opposition to The Sports Authority's Motion.) At that time, the police officers seized a .9 mm Ruger semi-automatic pistol, several rounds of ammunition, and a .177 pellet/BB rifle from Lonabaugh. (Complaint, ¶ 7.) As a further result of this incident, the Camden County Sheriff's Department and the Camden County Prosecutor's Office entered into a Forfeiture Consent Order with Lonabaugh, seizing Lonabaugh's weapons and ammunition. (Complaint, ¶ 8; Exhibit D to Plaintiff's Opposition to The Sports Authority's Motion.) The State-issued permit held by Lonabaugh for the purpose of purchasing a rifle or shotgun was not revoked. (Complaint, ¶ 8.)

On April 30, 1996, the Gloucester City Police Department was summoned to a domestic violence incident at Scott Lonabaugh's residence. (Complaint, ¶ 10.) Lonabaugh had tied up Cindy Nannay and was threatening her with a knife. (State Defendants' Statement of Material Facts, ¶ 13; Gloucester City Police Department Investigation Report, attached as Exhibit B to Plaintiff's Opposition to The Sports Authority's Motion.) As a result of the April 30, 1996 incident, Cindy Ann Nannay sought and obtained a restraining order against Scott Lonabaugh. (Complaint, ¶ 6; State Defendants' Statement of Material Facts, ¶ 14.) She subsequently requested that the charges and restraints be dropped, so the matter was dismissed. (Exhibit F to State Defendants' Counsel's Certification Submitted in Support of Motion; State Defendants' Statement of Material Facts, ¶ 15.)

Shortly after this incident, Cindy Nannay called defendant Frank Hogan, her manager at the radio station, at home and told him that she and Lonabaugh had had an argument, that Lonabaugh raised his voice and had tried to tie her to a chair. (Exhibit A to Plaintiff's Counsel's Certification in Opposition to State Defendants' Motion, Deposition of Frank Hogan, p. 14.) Hogan advised Nannay to consider getting out of the relationship and to take advantage of the counseling center at the college the following day. (Exhibit A to Plaintiff's Counsel's Certification in Opposition to State Defendants' Motion, Deposition of Frank Hogan, p. 14.) However, Cindy Nannay continued the relationship with Scott Lonabaugh and the two continued to live together. (State Defendants' Statement of Material Facts, ¶ 17.)

At some point, possibly in May of 1996, Scott Lonabaugh was treated for mental problems at the Shoreline Behavior Health Center in Toms River, New Jersey. (Statement of Rene DeBosscher, Gloucester County Prosecutor's Office Event Re-

port, attached as Exhibit A to Plaintiff's Opposition to The Sports Authority's Motion, p. 5.) After his release from Shoreline, Scott Lonabaugh and Cindy Nannay took up residence with Lonabaugh's mother, defendant Sara Lonabaugh, and her boyfriend, defendant Rene DeBosscher, in Thorofare, New Jersey. (Statement of Rene DeBosscher, Gloucester County Prosecutor's Office Event Report, attached as Exhibit A to Plaintiff's Opposition to The Sports Authority's Motion, p. 5.)

On or about July 30, 1996, Cindy Ann Nannay broke off her relationship with Scott Lonabaugh and moved out of the shared living accommodations. (State Defendants' Statement of Material Facts, ¶ 12.) She moved in with a woman named Bonnie who was affiliated with her Church. (State Defendants' Statement of Material Facts, ¶ 18.)

On August 1, 1996, Cindy Nannay met with defendant Pearl Bartelt, Dean of Liberal Arts and Sciences at Rowan College, and requested the college's assistance in providing her with housing. (State Defendants' Statement of Material Facts, ¶ 19 (relying on Exhibit J to State Defendants' Counsel's Certification in Support of Motion, Deposition of Pearl Bartelt).) At that time, Cindy Nannay advised Dean Bartelt that there had been some single "physical incident" which precipitated her needing housing. (Exhibit J to State Defendants' Counsel's Certification in Support of Motion, Deposition of Pearl Bartelt, p. 8.) Dean Bartelt arranged, through the Director of Residence Life, for Cindy Nannay to receive emergency housing on campus free of charge and for her to receive counseling through the campus counseling center beginning on August 5, 1996. (Complaint, ¶ 13; Exhibit J to State Defendants' Counsel's Certification in Support of Motion, Deposition of Pearl Bartelt, p. 10–11, 13.)

During this time, approximately two weeks prior to August 12, 1996, Scott Lonabaugh attempted to commit suicide, by cutting his left wrist. (Complaint, ¶ 5;

Statement of Rene DeBosscher, Gloucester County Prosecutor's Office Event Report, attached as Exhibit A to Plaintiff's Opposition to The Sports Authority's Motion, p. 5.) He was treated at Underwood Memorial Hospital and Crisis Intervention and released. (Complaint, ¶ 5; Statement of Rene DeBosscher, Gloucester County Prosecutor's Office Event Report, attached as Exhibit A to Plaintiff's Opposition to The Sports Authority's Motion, p. 5.) At some point, Scott Lonabaugh lost his home due to a bankruptcy associated with his divorce, and he began seeing a psychologist. (Statement of Rene DeBosscher, Gloucester County Prosecutor's Office Event Report, attached as Exhibit A to Plaintiff's Opposition to The Sports Authority's Motion, p. 5.)

On or about August 4, 1996, Cindy Nannay again called Frank Hogan at home and told him that Scott Lonabaugh had hit her, and that she was going to leave him, and that Dean Bartelt had arranged for campus housing for her. (Exhibit A to Plaintiff's Counsel's Certification in Opposition to State Defendants' Motion, Deposition of Frank Hogan, p. 19–20.) Hogan again advised Nannay to seek counseling, and Nannay informed him that she had an appointment for the following day. (Exhibit A to Plaintiff's Counsel's Certification in Opposition to State Defendants' Motion, Deposition of Frank Hogan, p. 20.) Dean Bartelt then called Hogan at home and confirmed that she had made arrangements for Cindy Nannay to obtain campus housing. (Exhibit A to Plaintiff's Counsel's Certification in Opposition to State Defendants' Motion, Deposition of Frank Hogan, p. 20–21.)

On August 5, 1996, Cindy Nannay did meet with a counselor who urged her to file a complaint with Rowan's Department of Public Safety for phone harassment and who arranged a meeting with a representative of People Against Spousal Abuse to discuss Nannay's options, such as her right to file a complaint against her abuser and her right to seek a restraining order. (Af-

fidavit of Cynthia Kammer submitted in Support of State Defendants' Motion; State Defendants' Statement of Material Facts, ¶¶ 22, 23.) On August 6, 1996, Cindy Nannay again met with the counselor who personally escorted her to the meeting with the PASA counselor. (Affidavit of Cynthia Kammer submitted in Support of State Defendants' Motion, ¶ 4.)

On August 9, 1996, Scott Lonabaugh purchased a 12 gauge shotgun from defendant The Sports Authority located in Maple Shade, New Jersey. (Complaint, ¶¶ 9, 11; Sports Authority's Statement of Undisputed Material Facts, ¶ 1.) The sale was handled by a manager for The Sports Authority, Wayne Jacobsen. (Sports Authority's Statement of Undisputed Material Facts, ¶ 4.)

In order to complete the purchase, Scott Lonabaugh presented two necessary forms of identification, his New Jersey Driver's License and his State of New Jersey Firearms Purchaser Identification Card issued November 11, 1991. (Sports Authority's Statement of Undisputed Material Facts, ¶ 2.) In addition, Lonabaugh signed a Certificate of Eligibility as required by the State of New Jersey, and in doing so certified that he was not subject to any of the disabilities, which a firearms purchaser is obligated to be familiar with, set forth in N.J. Stat. Ann. § 2C:58-3c.[1] (Sports Authority's Statement of Undisputed Material Facts, ¶ 3.) Finally, Scott Lonabaugh completed and signed the appropriate portion of the Bureau of Alcohol, Tobacco, and Firearms—Firearms Transaction Record.[2] (Sports Authority's Statement of Undisputed Material Facts, ¶ 3; Exhibit G to Plaintiff's Opposition to The Sports Authority's Motion.) On this form, a copy of which is attached to the Attorney's Certification in Support of Defendant The Sports Authority's Motion for Summary Judgment, Lonabaugh filled out his name and gender, height, weight, race, residence address[3], date of birth, and place of birth. Under the heading "CERTIFICATION OF TRANSFEREE (Buyer)—An untruthful answer may subject you to criminal prosecution. Each question must be answered with a 'yes' or a 'no' inserted in the box at the right of the question.", Lonabaugh wrote "No" in the indicated box following each of the following separately lettered questions:

(a) Are you under indictment or information in any court for a crime punishable by imprisonment for a term exceeding one year?

---

1. This section of the statute states that no firearms purchaser identification card shall be issued to any person who has been convicted of a crime; to any drug dependent person, to any person who is confined for a mental disorder to a hospital, mental institution or sanitarium, to any person who is a habitual drunkard; to any person who suffers from a physical defect or disease which would make it unsafe for him to handle firearms, *to any person who has ever been confined for a mental disorder*, or to any alcoholic unless any of the foregoing produces a certificate of a medical doctor or psychiatrist licensed in New Jersey, or other satisfactory proof that he is no longer suffering from that particular disability in such a manner that would interfere with or handicap him in handling firearms; to any person who knowingly falsifies any information on the application form for a firearms purchaser identification card; to any person under 18 years of age; to any person where the issuance would not be in the interest of the public health, safety or welfare; or to any person who is subject to a domestic violence restraining order prohibiting the person from possessing any firearm.

2. This form is also known as ATF F 4473, the federal form, and is the means of informing the buyer and seller that the buyer, under penalty of federal prosecution, must furnish his true name, address, sex, height, weight, race, date of birth, and place of birth. The buyer must answer a series of questions, swear that he answered the questions truthfully, and acknowledge that failing to do so is a felony.

3. In the space for residence address, Scott Lonabaugh listed the Gloucester address, which was the same address shown of his driver's license and firearms purchaser identification card, although he no longer lived at that location.

(b) Have you been convicted in a court of any crime punishable by imprisonment for a term exceeding one year?

(c) Are you a fugitive from justice?

(d) Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, or narcotic drug, or any other controlled substance?

(e) Have you ever been adjudicated mentally defective or have you ever been committed to a mental institution?

(f) Have you been discharged from the armed forces under dishonorable conditions?

(g) Are you an alien illegally in the United States?

(h) Are you a person who, having been a citizen of the United States, has renounced his/her citizenship?

(i) Are you subject to a court order restraining you from harassing, stalking, or threatening an intimate partner or child of such partner? [4]

Lonabaugh then signed the form, thereby certifying that the answers to the above questions were true and correct, and acknowledging that he understood that the making of any false oral or written statement or the exhibiting of any false or misrepresented identification with respect to the transaction was a felony.

Wayne Jacobsen completed the remainder of the form, listing the identification used to establish the identity and address of the buyer as Lonabaugh's New Jersey Firearms Purchaser Identification Card and New Jersey Driver's License. Wayne Jacobsen has testified that he has no inde-pendent recollection of the date of the sale, of the sale itself, or of speaking to Scott Lonabaugh. (Jacobsen Dep. 39:15–18; 41:16–18; 44:23–25; 45:13–16, attached as Exhibit F to Plaintiff's Opposition to The Sports Authority's Motion.)

On August 12, 1996, Cindy Ann Nannay arrived for work at the college radio station at approximately 1:00 p.m. for a 1:00 to 3:00 shift. (Complaint, ¶ 14; State Defendants' Statement of Material Facts, ¶ 24 (relying on Hogan Deposition, attached as Exhibit H to State Defendants' Counsel's Certification in Support of Motion).) At approximately 2:00 p.m., she asked Frank Hogan if he would still be at the station at 3:00 p.m., because Scott Lonabaugh was supposed to be meeting her to return some of her personal belongings and she wanted to be sure that Lonabaugh "didn't try to hit her or anything like that." (Complaint, ¶ 15; State Defendants' Statement of Material Facts, ¶ 25 (relying on Hogan Deposition, attached as Exhibit H to State Defendants' Counsel's Certification in Support of Motion).) Hogan stated that he would still be around at 3:00, but offered to give Nannay some money to replace her belongings so that she would not have to meet with Lonabaugh. (State Defendants' Statement of Material Facts, ¶ 26 (relying on Hogan Deposition, attached as Exhibit H to State Defendants' Counsel's Certification in Support of Motion).) She declined the offer. (State Defendants' Statement of Material Facts, ¶ 26 (relying on Hogan Deposition, attached as Exhibit H to State Defendants' Counsel's Certification in Support of Motion).)

4. The explanation for this question on the reverse side of the form elaborates:

Under 18 U.S.C. § 922 firearms may not be sold to or received by persons subject to a court order that: (A) was issued after a hearing of which the person received actual notice and had an opportunity to participate; (B) restraining such person from harassing, stalking, or threatening an intimate partner or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and (C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury.

At approximately 3:25 p.m., Scott Lonabaugh drove onto the Rowan College campus and parked 25–50 yards from the doors of the radio station. (Complaint, ¶ 16; Gloucester County Prosecutor's Office Event Report, attached as Exhibit A to Plaintiff's Opposition to The Sports Authority's Motion, p. 1.) Shortly thereafter, Cindy Ann Nannay walked out to Lonabaugh's car, which was parked in Lot E between Bozarth and Bunce Halls, on the campus. (Complaint, ¶ 17.) Frank Hogan and another student waited outside the radio station building. (State Defendants' Statement of Material Facts, ¶ 27; Gloucester County Prosecutor's Office Event Report, attached as Exhibit A to Plaintiff's Opposition to The Sports Authority's Motion, p. 3.) Lonabaugh and Nannay had a calm conversation, and Lonabaugh removed Nannay's bags from the passenger compartment of the car and placed them on the grass. (Complaint, ¶ 18; Gloucester County Prosecutor's Office Event Report, attached as Exhibit G to State Defendants' Counsel's Certification in Support of Motion and Exhibit A to Plaintiff's Opposition to The Sports Authority's Motion, p. 4.) He then proceeded to the trunk of the car, opened it, removed the shotgun and shot Cindy Ann Nannay in the shoulder, knocking her to the ground. (Complaint, ¶ 18; Gloucester County Prosecutor's Office Event Report, attached as Exhibit G to State Defendants' Counsel's Certification in Support of Motion and Exhibit A to Plaintiff's Opposition to The Sports Authority's Motion.) Lonabaugh then aimed the shotgun at Cindy Nannay's head and fired, killing her. (Complaint, ¶ 18; Gloucester County Prosecutor's Office Event Report, attached as Exhibit A to Plaintiff's Opposition to The Sports Authority's Motion.) Immediately thereafter, he turned the gun on himself and committed suicide. (Complaint, ¶ 18; Gloucester County Prosecutor's Office Event Report, attached as Exhibit A to Plaintiff's Opposition to The Sports Authority's Motion.) A suicide note was found in the car by investigators. (Gloucester County Prosecutor's Office

Event Report, attached as Exhibit A to Plaintiff's Opposition to The Sports Authority's Motion, p. 5.)

At no time did Cindy Ann Nannay, or any other person, contact Rowan's Department of Public Safety or any other law enforcement agency (including Rowan's escort service) to request assistance prior to the shooting. (State Defendants' Statement of Material Facts, ¶ 29.) Further, it is not disputed that neither defendant Kevin Mannix nor any other member of the Public Safety Department was ever notified of any domestic violence situation existing between Cindy Nannay and Scott Lonabaugh. (State Defendants' Statement of Material Facts, ¶ 30.)

It also is uncontested that after the incident, the Bureau of Alcohol, Tobacco, and Firearms conducted a trace of the firearm as standard policy, and that The Sports Authority did not thereafter receive any sort of notice that the sale of the shotgun to Scott Lonabaugh was in violation of any law. (Sports Authority's Statement of Undisputed Material Facts, ¶ 6.)

## PROCEDURAL HISTORY

Plaintiff, Grace M. Nannay, General Administratrix and Administratrix Ad Prosequendum of the Estate of Cindy Ann Nannay, deceased, instituted this lawsuit on August 6, 1998 against defendants Rowan College, the State of New Jersey, Kevin Mannix, Pearl Bartelt, Frank Hogan, the County of Camden, the Camden County Prosecutor's Office, the Camden County Sheriff's Office, Gloucester City Police Department, Patrolman Robert Reynolds, Det. Lt. William P. James, Rene DeBosscher, Sarah Lonabaugh, Tammy Lonabaugh, Traci Lonabaugh, Our Lady of Lourdes Hospital, Underwood Memorial Hospital, and The Sports Authority.

Count One alleges that defendants Rowan College, the State of New Jersey, Kevin Mannix, the Public Safety Director for Rowan College, Pearl Bartelt, Dean of Liberal Arts and Sciences for Rowan Col-

lege, and Frank Hogan, the General Manager of the college radio station, WGLS, knew or should have known of the propensity for Scott Lonabaugh to commit acts of violence upon Cindy Nannay, had a duty to exercise reasonable care and diligence for the personal safety of the college community, including Cindy Nannay,[5] and failed to take the necessary measures to protect Cindy Nannay from the attack by Scott Lonabaugh. Thus, Count One states a claim for negligence.

Count Two asserts a claim against Rowan College for voluntarily assuming, through its employees, the protection of Cindy Nannay from domestic violence by Scott Lonabaugh, and then violating Cindy Nannay's Fourteenth Amendment Substantive Due Process Rights. The reasoning is that Rowan College, through its employees, was aware of the domestic violence situation which existed between Cindy Nannay and Scott Lonabaugh, and made arrangements, such as the provision of temporary campus housing, in an effort to protect Cindy Nannay from the violent acts of Scott Lonabaugh. By creating dangerous conditions, including permitting Lonabaugh to enter the campus and come in close physical contact with Cindy Nannay without a weapons search or other security queries, when Rowan College, through its employees, knew of Lonabaugh's propensity to commit violent acts with a weapon against Cindy Nannay, it is alleged that the College deprived Nannay of her liberty interest in personal security and her liberty interest to be free from bodily harm. This Count also mentions a failure to train in proper security measures, and failure to take proper security measures to protect Nannay in willful disregard of the voluntarily assumed duties to protect and safeguard Nannay against the violent actions of Lonabaugh. The demand for damages is asserted against defendants Rowan College, the State of New Jersey, Kevin Mannix, Pearl Bartelt, and Frank Hogan.

Count Three asserts a claim against Frank Hogan for, while acting under color of State law, violating Cindy Nannay's substantive due process rights by depriving her of her liberty interests in personal security and freedom from bodily harm in voluntarily assuming responsibility for the safety of Cindy Nannay in a pending encounter with Scott Lonabaugh, creating dangerous conditions and the danger of bodily harm, isolating her from a private or public source of rescue, condoning, ratifying, and/or instigating a physical encounter between Nannay and Lonabaugh, permitting Nannay to enter into close physical proximity with Lonabaugh, and otherwise showing willful disregard.

Count Four similarly asserts a claim against Pearl Bartelt for violating Cindy Nannay's constitutional rights because she knew that Scott Lonabaugh posed a special danger to Cindy Nannay and she voluntarily assumed responsibility for Nannay's safety in a pending encounter with Lonabaugh because she had arranged for temporary campus housing and had made other arrangements to protect Nannay from Lonabaugh.

Count Five asserts the same type of claim against Kevin Mannix as Director of Public Safety for Rowan College.

Count Six asserts a claim against the County of Camden, the Camden County Prosecutor's Office, and the Camden County Sheriff's Department based upon their failure, after seizing guns already in Lonabaugh's possession, to take adequate steps to prevent Lonabaugh from purchasing additional firearms, including the shotgun which he used to kill Cindy Nannay.

Count Seven asserts the same claim as Count Six, but against the Gloucester City Police Department. Count Eight asserts the same claim against Patrolman Robert

---

**5.** This Count further alleges that Rowan College had a duty (1) to formulate and implement policies to prevent incidents such as the one in this case and (2) to train and supervise its employees to prevent incidents such as this one.

Reynolds. Count Nine asserts the same claim against Detective Lt. William P. James.

Count Ten brings a wrongful death claim, pursuant to N.J. Stat. Ann. § 2A:31–1–6 et seq. against Rowan College, the State of New Jersey, Kevin Mannix, Pearl Bartelt, and Frank Hogan.

Count Eleven brings a negligence claim against the County of Camden, the Camden County Prosecutor's Office, and the Camden County Sheriff's Department.

Count Twelve asserts a negligence claim against Rene DeBosscher, Sarah Lonabaugh, Tammy Lonabaugh, and Traci Lonabaugh in that they knew or should have known that Scott Lonabaugh had a history of mental problems and a propensity for committing violent acts upon Cindy Nannay, they knew that on August 12, 1996, Scott Lonabaugh was scheduled to meet Cindy Nannay, and they knew that he had loaded a shotgun in the trunk of his car along with Cindy Nannay's possessions, but they did nothing to warn Cindy Nannay or the police or the college of the impending assault.

Count Thirteen asserts a claim against Our Lady of Lourdes Hospital and Underwood Memorial Hospital for negligence in discharging Scott Lonabaugh after his suicide attempt, rather than seeking involuntary commitment, knowing that he was mentally ill and a danger to himself and others.

Count Fourteen asserts a negligence claim against The Sports Authority for selling a firearm to Scott Lonabaugh without checking with local governmental authorities prior to the sale to determine whether he had any prior criminal convictions or otherwise posed a threat to the public at large when in possession of a firearm. This Count further alleges that The Sports Authority failed to follow proper procedures to be used in the sale of a firearm, including the verification of a firearms identification card, failure to properly fill out a Form 4473 pursuant to federal law, failure to complete an appropriate Certificate of Eligibility, failure to utilize appropriately credentialed salesmen, and other failures to follow federal and state laws governing the sale of firearms.

Count Fifteen is a demand for damages, interest, attorney's fees, and costs of suit against all defendants, jointly, severally or in the alternative.

On February 22, 1999, a Stipulation of Dismissal without prejudice and without costs was entered as to Our Lady of Lourdes Hospital, the parties having represented to the Court that the matter had been amicably adjusted by and between the parties. On June 10, 1999, Underwood Memorial Hospital was dismissed from the case as the result of an unopposed motion to dismiss. On October 29, 1999, this Court similarly granted an unopposed motion for summary judgment in favor of Gloucester City Police Department, Patrolman Robert Reynolds, and Det. Lt. William P. James. On November 22, 1999, an Order was entered dismissing this matter with prejudice as to the County of Camden, the Camden County Prosecutor's Office, and the Camden County Sheriff's Office, as the parties represented to the Court that the matter had been amicably adjusted by and between them.

The movants before the Court at this time comprise the entirety of the remaining defendants. The Sports Authority filed a motion for summary judgment on October 4, 1999. Rowan College, the State of New Jersey, Kevin Mannix, Pearl Bartelt, and Frank Hogan filed a motion for summary judgment on November 5, 1999. Finally, on November 10, 1999, the Lonabaugh Family members, Rene DeBosscher, Sarah Lonabaugh, Tammy Lonabaugh, and Traci Lonabaugh, filed a motion to dismiss the Complaint against them.

*SUMMARY JUDGMENT STANDARD*

The entry of summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if, under the governing substantive law, a dispute about it might affect the outcome of the suit. *Id.* In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its opening burden, the non-moving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. The non-moving party may not rest upon the mere allegations or denials of its pleading. *Id.; Maidenbaum v. Bally's Park Place, Inc.,* 870 F.Supp. 1254, 1258 (D.N.J.1994). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

However, in deciding the motion, the court does not "weigh the evidence and determine the truth of the matter, but [instead] determine[s] whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. If the non-movant has provided evidence exceeding the "mere scintilla" threshold in demonstrating a genuine issue of material fact, the court cannot weigh the evidence and credit the movant's interpretation of the evidence. This is so even if the movant's evidence far outweighs the non-movant's evidence. Credibility determinations are the province of the factfinder. *Big Apple v. BMW of North America,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

### STANDARD ON A MOTION TO DISMISS

When considering a motion to dismiss for failure to state a claim upon which relief can be granted, the reviewing court must accept all well pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Schrob v. Catterson,* 948 F.2d 1402 (3d Cir.1991); *Rogin v. Bensalem Township,* 616 F.2d 680, 685 (3d Cir.1980), *cert. denied,* 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981). A court may not dismiss the complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (citations omitted); *D.P. Enterprises, Inc. v. Bucks County Community College,* 725 F.2d 943, 944 (3d Cir.1984).

It is not necessary to plead evidence, and it is not necessary to plead the facts that serve as the basis for the claim. *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 446 (3d Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). "Although the Federal Rules of Civil Procedure do not require a claimant to set forth an intricately detailed description of the asserted basis for relief, they do require that the pleadings 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Baldwin County Welcome Center v. Brown,* 466

282

U.S. 147, 149–50 n. 3, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) (quoting *Conley,* 355 U.S. at 47, 78 S.Ct. 99).

## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants the State of New Jersey, Rowan College, Kevin Mannix, Pearl Bartelt, and Frank Hogan base their motion for summary judgment on the doctrine derived from *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), that there is no obligation upon the State to protect individuals from the criminal acts of third parties, absent a special relationship. In addition, these defendants argue that they did not in any manner create any danger to Cindy Nannay nor did they exacerbate the threat of harm posed to her by Scott Lonabaugh. *See Kneipp v. Tedder,* 95 F.3d 1199 (3d Cir.1996). Further, they contend that the State and the college are immune from suit pursuant to the Eleventh Amendment and that the individual defendants are immune from a negligence suit for their objectively reasonable acts, and pursuant to the Tort Claims Act, N.J. Stat. Ann. § 59:1–1 et seq. and the Charitable Immunity Act, N.J. Stat. Ann. § 2A:53A–7.

Section 1983 provides a civil remedy against any person who, under color of state law, deprives another of rights protected by the Constitution. *See Collins v. City of Harker Heights,* 503 U.S. 115, 120, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). Section 1983 does not itself confer any substantive rights; it merely serves as a vehicle to enforce rights granted through the Constitution or through federal law. *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). To state a claim under § 1983, a plaintiff must establish two essential elements: (1) the

violation of a right secured by the Constitution or laws of the United States; and (2) that the alleged deprivation was committed by a person acting under the color of state law.[6] *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).

Insofar as plaintiff has alleged a claim for damages pursuant to 42 U.S.C. § 1983 against the State of New Jersey, such claim will be dismissed, as the United States Supreme Court has held that "neither a State nor its officials acting under their official capacities are 'persons' under § 1983." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

Plaintiff has argued in opposition to the motion that under *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), liability may be established as against the State and Rowan as public entities if plaintiff can show that the harm caused was the result of the execution of an official policy or custom. In this case, plaintiff's expert, Leslie Cole, criticizes the official policies of Rowan University regarding visitors on campus and security measures by indicating that security on campus was lax due to official decisions made by representatives of Rowan University and the State of New Jersey.

■ Plaintiff's reliance on *Monell* is misplaced, however, as that case dealt with section 1983 liability of local government and entities. Although the Supreme Court has repeatedly concluded that municipal corporations and similar governmental entities are "persons" subject to suit, *see, e.g., Monell,* 436 U.S. at 663, 98 S.Ct. 2018, a State is not a "person" within the meaning of section 1983. *See Howlett v. Rose,* 496 U.S. 356, 377, 110 S.Ct. 2430, 110

**6.** 42 U.S.C. § 1983 provides in pertinent part that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States ... to

the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983 (West 2000 Suppl.).

L.Ed.2d 332 (1990); *Will v. Michigan Department of State Police,* 491 U.S. 58, 65–66, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Quern v. Jordan,* 440 U.S. 332, 343–344, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

■ In addition, the State itself is immune from suit under the Eleventh Amendment to the United States Constitution, which reads:

The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

Thus, absent consent by a state, suits for money damages against a State or State officials in their official capacities are barred by the Eleventh Amendment. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), *cited in Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 99, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). *See also Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (concluding that Eleventh Amendment barred official capacity action for damages in § 1983 suit); *Edelman v. Jordan,* 415 U.S. 651, 653, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (holding that suit against State official for retroactive monetary relief, which requires payment of funds from state treasury is barred by Eleventh Amendment).

For these reasons, summary judgment will be granted in favor of the State of New Jersey. The State defendants next argue that all claims against Rowan College, now Rowan University, also must be dismissed pursuant to the Eleventh Amendment because Rowan University is the alter ego of the State for Eleventh Amendment purposes.

■ The Eleventh Amendment immunity from suit extends to "agencies or departments" of the State. *Pennhurst,* 465 U.S. at 100, 104 S.Ct. 900 ("It is clear, of course, that in the absence of consent, a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment.") Such "agencies or departments" of the State of New Jersey include its Department of Public Safety and its Division of State Police. *See* N.J. Stat. Ann. § 52:17B–2; *Simmerman v. Corino,* 804 F.Supp. 644, 650 (D.N.J.1990). Whether Rowan University should be entitled to Eleventh Amendment immunity, however, is not settled in the Circuit. *See Kovats v. Rutgers, The State University,* 822 F.2d 1303, 1312 (3d Cir.1987) (Rutgers not entitled to Eleventh Amendment immunity); *State of New Jersey, Department of Environmental Protection v. Gloucester Environmental Management Services, Inc.,* 923 F.Supp. 651 (D.N.J.1995) (finding very close question but concluding Trenton State College and Glassboro State College not alter egos of the State under the Eleventh Amendment); *Rehberg v. Glassboro State College,* 745 F.Supp. 1113, 1115 (E.D.Pa.1990) (Glassboro State College entitled to sovereign immunity).

■ In *Fitchik v. New Jersey Transit Rail Operations, Inc.,* 873 F.2d 655, 659 (3d Cir.) (en banc), *cert. denied,* 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 107 (1989), the Third Circuit clarified the factors first set forth in *Urbano v. Board of Managers of New Jersey State Prison,* 415 F.2d 247 (3d Cir.1969), *cert. denied,* 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 128 (1970), which must be considered by the Court in determining whether an entity is part of the State for Eleventh Amendment purposes. The factors are:

(1) Whether the money that would pay the judgment would come from the state (this includes three of the *Urbano* factors—whether payment will come from the state's treasury, whether the agency has the money to satisfy the judgment, and whether the sovereign has immunized itself from responsibility for the agency's debts);

(2) The status of the agency under state law (this includes four factors—how

state law treats the agency generally, whether the entity is separately incorporated, whether the agency can sue or be sued in its own right, and whether it is immune from state taxation); and

(3) What degree of autonomy the agency has.

*Fitchik,* 873 F.2d at 659.

■ The State defendants have submitted an affidavit from the Vice President of Administration and Finance of Rowan University to the effect that any judgment rendered against Rowan University would be paid directly from the State treasury through the State Tort Claims Fund; Rowan is considered to be part of the State for purposes of the New Jersey Tort Claims Act. (Affidavit of Lawrence J. Reader, ¶ 7; N.J. Stat. Ann. §§ 59:1–3, 12–1.) The affidavit also states that Rowan University has set aside no funds to meet its liabilities for injury and damages claims, such as those asserted in this lawsuit. (Affidavit of Lawrence J. Reader, ¶ 11.) Moreover, it appears that the State has not immunized itself from Rowan's debts, as although Rowan has the power to enter into contracts, the State has retained liability for any contractual debt accruing against Rowan. N.J. Stat. Ann. §§ 18A:64–52 to 64–81, 59:13–1 et seq. *Compare Kovats,* 822 F.2d 1303 (State was under no obligation to pay Rutgers' debts or to reimburse it for any judgments).

Rowan is not separately incorporated, N.J. Stat. Ann. § 18A:64–1 et seq., it does not have, on its own, the power to sue and be sued, N.J. Stat. Ann. §§ 18A:64–6, 3B–6, and it is exempt from State sales/use tax pursuant to N.J. Stat. Ann. § 54:32B–1 et seq. (Affidavit of Lawrence J. Reader, ¶ 4.) *See also Gloucester Envtl. Management Services,* 923 F.Supp. at 658–59 (analysis of second *Fitchik* factor—status under State law—favors finding immunity of Rowan College). Finally, the State defendants have set forth several arguments to illustrate that the State of New Jersey retains significant control over Rowan University, including that Rowan must adhere to the New Jersey Administrative Procedure Act, New Jersey civil service rules, and State competitive bidding requirements. *See also Rehberg,* 745 F.Supp. at 1115–16 (applying *Fitchik* factors to Glassboro State College (subsequently named Rowan College) and finding the uncontroverted evidence of record as establishing that the State retains significant control over the school's structure).

It appears, then, that applying the *Fitchik* test in this case leads to a conclusion that Rowan is entitled to Eleventh Amendment immunity. For the reasons outlined, and because the plaintiff has not opposed the argument that Rowan University is entitled to Eleventh Amendment immunity, summary judgment will be granted in Rowan's favor. Alternatively, Rowan would enjoy a grant of summary judgment for the same reasons which are discussed next as grounds for granting summary judgment in favor of the individual defendants.

■ In moving for summary judgment in favor of the individual State defendants, it is argued that a State generally has no affirmative obligation under the Constitution to protect its citizens from the violent acts of private individuals. *DeShaney v. Winnebago County Dep't of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In general, it is true, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197, 109 S.Ct. 998. However, "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *Id.* at 198, 109 S.Ct. 998. Such an exception to the general rule is present in the case of prisoners, *Estelle v. Gamble,* 429 U.S. 97, 103–04, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), involuntarily committed mental patients, *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), and foster children, *DeShaney,* 489 U.S. at 201

n. 9, 109 S.Ct. 998. The Third Circuit has read *DeShaney* primarily as setting out a test of physical custody. *D.R. by L.R. v. Middle Bucks Area Vocational Technical School,* 972 F.2d 1364, 1372 (3d Cir.1992), *cert. denied* 506 U.S. 1079, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993) (no special relationship based upon a restraint of liberty exists between high school officials and school children which would have created a duty for section 1983 purposes); *Philadelphia Police & Fire Ass'n for Handicapped Children, Inc. v. City of Philadelphia,* 874 F.2d 156, 167 (3d Cir.1989) ("the state continues to owe an affirmative duty to protect those physically in its custody"). *See also Fialkowski v. Greenwich Home for Children, Inc.,* 921 F.2d 459 (3d Cir. 1990) (deciding no *Youngberg* duty of care exists for mentally retarded adult voluntarily placed at institution because the state has not substantially curtailed his freedom).

Another exception to the general rule of there being no affirmative duty to act arises where the State has created or exacerbated the danger which a third party poses to the plaintiff. In *Brown v. Grabowski,* 922 F.2d 1097 (3d Cir.1990), the Third Circuit considered the State-created danger theory where the plaintiff's decedent reported to the police that her former boyfriend had held her hostage, threatened her, and sexually assaulted her for three days. The police did not place her abductor under arrest, and failed to inform her of her right to request a temporary restraining order under New Jersey's Prevention of Domestic Violence Act, N.J. Stat. Ann. § 2C:25–7. She was subsequently found dead in the trunk of her abductor's car. The Third Circuit concluded that the plaintiff "supplied no evidence that [the state actors] acted to create or to exacerbate the danger that [the abductor] posed to [her], thereby triggering a possible constitutional duty to assist her in gaining access to the civil courts." *Brown v. Grabowski,* 922 F.2d at 1116.

Similarly, in *D.R.,* the Third Circuit found that for purposes of a section 1983 action against school officials by public high school students who were allegedly molested by other students, the school defendants did not create danger that eventuated violation of plaintiffs' constitutional rights. There, two female students at a public high school alleged that they were physically, verbally and sexually molested by male students in a unisex bathroom and in a darkroom, which were parts of the graphic arts classroom. The students' parents brought a civil rights action against the school district and several school officials and employees, alleging that the defendants created the danger that resulted in a violation of the plaintiffs' constitutional rights. In support of this claim, plaintiffs argued that the school defendants " 'created a climate which facilitated sexual and physical abuse of students' " and, having thrust plaintiffs into this situation, "were obligated to protect them from violations of their personal bodily integrity by other students who were also under defendants' control." *Id.* at 1373. The Third Circuit found that plaintiffs' allegations did not show that defendants either impermissibly limited freedom of plaintiffs to act on their own behalf or barred their access to outside support, nor did they demonstrate that defendants violated a constitutional duty by creating or exacerbating danger posed by student defendants, thus the harm to the students resulted solely from the acts of private individuals. *Id.* at 1376.

■ In *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1141 (3d Cir.), *cert. denied,* 516 U.S. 858, 116 S.Ct. 165, 133 L.Ed.2d 107 (1995), the Third Circuit articulated a test for applying the State-created danger theory:

(1) the harm ultimately caused was foreseeable and fairly direct;

(2) the state actor acted in willful disregard for the safety of the plaintiff;

(3) there existed some relationship between the state and the plaintiff;

(4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.

*Mark*, 51 F.3d at 1152. The Court further noted that "[t]he cases where the state-created danger theory was applied were based on discrete, grossly reckless acts committed by the state or state actors using their peculiar positions as state actors, leaving a discrete plaintiff vulnerable to foreseeable injury." *Id.* at 1153.

■ Mindful of the foregoing Supreme Court and Third Circuit case law, this Court is of the opinion that the individual State defendants in this matter had no affirmative duty to act to protect Cindy Ann Nannay from the violence visited upon her by her third-party boyfriend Scott Lonabaugh, as her liberty was not restrained in any way by the State. Moreover, the Court finds that the State, through the individual defendants named here, did not create or exacerbate the danger which Scott Lonabaugh posed to Cindy Ann Nannay.

The plaintiff's position is that the individual State defendants in this case lulled Cindy Ann Nannay into a false sense of security, such that she let her guard down and agreed to meet with Lonabaugh on August 12, 1996 on Rowan's campus. Plaintiff cites to Dean Bartelt's offer of emergency housing and Frank Hogan's promise to watch over Nannay as the circumstances which led Cindy Nannay to agree to such a meeting. Plaintiff argues that upon being advised of the domestic violence situation involving Cindy Nannay, Dean Bartelt should have notified the Public Safety Department at Rowan so that some sort of response by that Department could have prevented the August 12th incident. Plaintiff insists that Frank Hogan, having been aware of the abusive relationship between Nannay and Lonabaugh, rather than watch out for Nannay himself, should have called the Public Safety Department's escort service so that a uniformed public safety officer could have

escorted Cindy Nannay to meet Scott Lonabaugh, thereby preventing the incident. Finally, plaintiff argues that it was the lack of adequate security at Rowan, for which Kevin Mannix is responsible, which allowed Lonabaugh to enter the campus in the first instance with a shotgun in the trunk of his car.

In *DeShaney*, the Supreme Court rejected the theory advanced by plaintiff in this case when the Court stated:

The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from the expressions of intent to help him but from the limitation which it has imposed on his own freedom to act on his own behalf.

*DeShaney*, 489 U.S. at 200, 109 S.Ct. 998.

Indeed, the circumstances here are tragic. However, it cannot be escaped that Cindy Ann Nannay, for all intents and purposes, voluntarily engaged in the contact with Scott Lonabaugh that resulted in her death. As the defendants have observed:

Nannay was an adult 22 year-old student who voluntarily attended Rowan University. She was free to leave the University grounds. Until shortly before her death she did not even reside on the Rowan campus. Nannay was not cut off from meaningful access to sources of help. To the contrary, the University provided her with counseling and assisted her in getting counseling from outside sources (PASA) to help her with respect to her domestic violence situation. Further, she was not wholly dependent upon the Rowan defendants for her most basic needs.

(State Defendants' Brief, p. 27.)

The defendants' assistance rendered to Cindy Nannay in finding housing and counseling in an attempt to help her avert future contact with Lonabaugh has not given rise to a duty of care which would subject these defendants to liability. Nor has such assistance created or exacerbated

a danger which Lonabaugh posed. There are not present in this case the type of discrete, grossly reckless acts committed by the State defendants which left Cindy Ann Nannay vulnerable to foreseeable injury. Even Frank Hogan's "standing watch" to see that Lonabaugh did not attack Nannay cannot be said to be of the deliberately indifferent nature which the courts have required in order to impose liability. Although some danger to Nannay may have been foreseeable, it was neither Hogan nor Bartelt, using their authority or positions as a State actors, nor Mannix, by anything he should have done, who placed Nannay in a dangerous position or acted in willful disregard for her safety.

Additionally, the Court disagrees with plaintiff's assessment that "[i]t is unlikely that Mr. Lonabaugh would have been able to so calmly and easily perform this act in a non-campus setting where Cindy Nannay would not have so easily agreed to meet him." To the contrary, it is likely that Nannay would have agreed to meet Lonabaugh in almost any "public" place, and Lonabaugh would have been able to calmly drive almost anywhere without having been detected as carrying a shotgun in the trunk of his car.

Finally, the record indicates that Cindy Nannay made her decision to meet with Lonabaugh outside of the actions taken by the defendants to help her. She agreed to meet Scott Lonabaugh at her workplace, not the residence arranged by Bartelt, *before* she even asked Hogan to remain nearby. The State defendants did not create an opportunity for Scott Lonabaugh to kill Cindy Nannay that would not have otherwise existed; they did not, as plaintiff has argued, "provid[e] Scott Lonabaugh with the opportunity and location to kill [Cindy Nannay]." The failure to act adequately in response to Lonabaugh's conduct which has been alleged in this case is not sufficient to impose liability where the Court finds there was no affirmative act by the State defendants which created the danger to Nannay.

As an alternative ground for their motion for summary judgment, the State defendants assert that Frank Hogan, Pearl Bartelt, and Kevin Mannix are entitled to qualified immunity. Qualified or "good faith" immunity is an affirmative defense to § 1983 liability. *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). "[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 1699–1700, 143 L.Ed.2d 818 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)) (internal quotation marks omitted). If the actions taken are those that a reasonable official could have believed lawful, dismissal on immunity grounds is warranted even if the defendant's conduct violated the plaintiff's constitutional rights. *Anderson v. Creighton,* 483 U.S. 635, 646 n. 6, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that [the action was lawful]; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Under this standard, qualified immunity protects all but the "plainly incompetent or those who knowingly violate the law." *Malley,* 475 U.S. at 343, 106 S.Ct. 1092.

■ The Third Circuit has adopted a two-pronged qualified immunity analysis. *Showers v. Spangler,* 182 F.3d 165, 171 (3d Cir.1999). *But see Rouse v. Plantier,* 182 F.3d 192, 196–97 (3d Cir.1999) (characterizing qualified immunity inquiry as three-part test). Under this approach, a court first must decide whether the defendant's

conduct as alleged by the plaintiff violated clearly established law. *Showers,* 182 F.3d at 171. Second, a court must determine whether, in light of the circumstances known to the defendant at the time, a reasonable official could have believed that the challenged conduct was lawful. *Showers,* 182 F.3d at 171. Generally, the issue of qualified immunity is a question of law for a court to decide unless material issues of disputed fact exist precluding summary judgment. *Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).

■ The Court agrees that the State actors in this case conducted themselves in an objectively reasonable fashion. As this Court has held, their conduct, even when taken as alleged by the plaintiff, cannot be found to have violated clearly established law. However, even if it had, that is— even if Cindy Nannay's constitutional rights were found to have been violated in this case, a reasonable official in each of the individual State defendant's positions, in light of the circumstances *known to each at the time* of his or her action (or inaction), certainly could have believed that the challenged conduct was lawful. Therefore, summary judgment will be granted in favor of the individual State defendants based on the alternative ground of qualified immunity.

### THE SPORTS AUTHORITY'S MOTION FOR SUMMARY JUDGMENT

In moving for summary judgment, The Sports Authority argues that the plaintiff has not produced any documentation or other evidence establishing that The Sports Authority failed in any manner to comply with its obligations pursuant to any applicable federal or state law pertaining to the sale of firearms, and therefore plaintiff cannot sustain any theory of negligence against The Sports Authority. The movant cites to *Di Cosala v. Kay,* 91 N.J. 159, 450 A.2d 508 (1982), to argue that the Court must weigh the relationship of the parties, the nature of the risk, and the public interest in determining whether the

shooting of Cindy Nannay in this case was foreseeable to the extent that The Sports Authority owed a special duty to her. The Sports Authority's position is that it bears no duty to protect a person from a shooting after the purchaser of a weapon lawfully purchases that firearm from the defendant's store. Again, The Sports Authority argues that there is no proof that it deviated from any standard of care because it complied with all applicable procedures by confirming Scott Lonabaugh's identification through his Social Security card and photo driver's license, by confirming that Scott Lonabaugh had a valid New Jersey Firearms Purchaser Identification Card, and by having Lonabaugh complete and sign the appropriate portions of a Certificate of Eligibility and a Bureau of Alcohol, Tobacco, and Firearms Firearms Transaction Record.

Next, The Sports Authority argues that even if it had a duty to Cindy Nannay and even if it breached that duty, it was Scott Lonabaugh's criminal act which proximately caused the damage in this case. Although proximate cause ordinarily is a question of fact for a jury, *Glaser v. Hackensack Water Co.,* 49 N.J.Super. 591, 589–99, 141 A.2d 117 (App.Div.1958), The Sports Authority argues that this case presents the type of exceptional circumstances which warrant the Court determining, as a matter of law, that the defendant's negligent conduct was not the legal cause of the plaintiff's harm. It cites *Port Authority of New York and New Jersey v. Arcadian Corp.,* 991 F.Supp. 390, 408 (D.N.J.1997), for support. In that case, the Court concluded, "The World Trade Center explosion was not proximately caused by defendants; rather, it was caused solely by the terrorists' intent to cause harm." *Id.*

Plaintiff admits that The Sports Authority did not receive any notification from the Bureau of Alcohol, Tobacco and Firearms, after that agency conducted an investigation triggered by the shooting, that the sale of the shotgun to Scott Lonabaugh

was in violation of any law. (Plaintiff's Response to Defendant's Statement of Material Facts, ¶ 6.)

Plaintiff states that at the time he purchased the shotgun, Scott Lonabaugh had a fresh wound on his wrist[7] indicating a recent suicide attempt. Also, Scott Lonabaugh had been committed to a mental institution prior to the purchase of the shotgun, as related by the Gloucester County Prosecutor's Office Event Report, prepared after the August 12, 1996 incident and attached as Exhibit A to plaintiff's opposition to the motion. Thus, plaintiff argues that Scott Lonabaugh was not truthful in his responses to questions on the Transaction Record and The Sports Authority, acting through Wayne Jacobsen, in taking no steps to ascertain the truthfulness of the answers, was negligent.

Plaintiff further argues that The Sports Authority violated 27 C.F.R. § 178.99(c) which prohibits the sale of a firearm to certain categories of persons. The pertinent section of the regulation reads:

A licensed manufacturer, licensed importer, licensed dealer, or licensed collector shall not sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person:

(1) Is, except as provided by § 178.143, under indictment for, or, except as provided by § 178.144, has been convicted in any court of a crime punishable by imprisonment for a term exceeding 1 year;

(2) Is a fugitive from justice;

(3) Is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substance Act, 21 U.S.C. § 802);

(4) Has been adjudicated as a mental defective or has been committed to any mental institution;

(5) Is an alien illegally or unlawfully in the United States;

(6) Has been discharged from the Armed Forces under dishonorable conditions;

(7) Who, having been a citizen of the United States, has renounced citizenship;

(8) Is subject to a court order that restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child, except that this paragraph shall only apply to a court order that—

(i) Was issued after a hearing of which such person received actual notice, and at which such person had the opportunity to participate; and

(ii)(A) Includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or

(B) By its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury,[8] or

(9) Has been convicted of a misdemeanor crime of domestic violence.

27 C.F.R. § 178.99(c).[9]

---

7. Although plaintiff argues that Scott Lonabaugh had wounds on both wrists, the photographs taken by the County Medical Examiner's Office and attached as Exhibit E to plaintiff's opposition show only the left wrist.

8. This subsection is inapplicable to the instant case because the April 30, 1996 restraining order entered against Lonabaugh (1) did not meet these procedural requirements and (2)

was withdrawn at the request of Cindy Nannay on May 7, 1996.

9. In addition, 18 U.S.C. § 922(d)(4) provides:

(d) It shall be unlawful for any person to sell or otherwise dispose of any firearm or ammu-

Plaintiff argues that this regulation requires the seller to take some measures to assess the competency of a firearms purchaser [10] but that The Sports Authority failed to take proper measures to assess the competency of Scott Lonabaugh and that such a failure is evidence of negligence which must be presented to the trier of fact. Regarding proximate cause, plaintiff contends that as long as the defendant's conduct is a substantial contributing factor for the harm suffered, the proximate cause issue may not be taken from the fact finder.

■ The sole question in need of resolution then is whether the fact that Scott Lonabaugh had to present identification cards and complete paperwork in the presence of the store manager when he had a freshly stitched slash mark on his wrist amply supports an inference that The Sports Authority, through Wayne Jacobsen, saw the wound and therefore had reasonable cause to believe that Lonabaugh had been "adjudicated as a mental defective or [had] been committed to any mental institution." If such an inference is supported by the evidence, then whether The Sports Authority breached a duty is a question of fact for a jury to determine.

However, it is plain that, despite the presence of federal regulation, this is a negligence claim pursuant to State law. Plaintiff's action is not one for civil relief under 18 U.S.C. § 922(d) or 27 C.F.R. § 178.99(c), but is one for negligence; the statute and the regulation are not mentioned as a ground for recovery but as a standard for measurement of the defendant's conduct.

Having stated that, 28 U.S.C. § 1367 provides, in pertinent part:

(a) ... [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties....

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... (3) the district court has dismissed all claims over which it has original jurisdiction....

Now that the claims brought pursuant to 42 U.S.C. § 1983 have been dismissed, the Court, in keeping with section 1367, has the discretion to exercise supplemental jurisdiction over the instant claim asserted against The Sports Authority. It will, however, decline to do so based on the consideration set forth in section 1367(c)(3), namely, the dismissal of all claims over which the Court had original jurisdiction. *See Figueroa v. Buccaneer Hotel Inc.*, 188 F.3d 172, 181 (3d Cir.1999). *See also Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir.1995) ("where the claim over which the district

---

nition to any person knowing or having reasonable cause to believe that such person—

. . . . .

(4) has been adjudicated as a mental defective or has been committed to any mental institution.

10. Plaintiff further argues that The Sports Authority undertook the duty to perform an examination or other assessment of prospective purchasers because Wayne Jacobsen testified that he made some limited assessment to determine whether purchasers were intoxicated because The Sports Authority follows a policy that it can refuse to sell firearms to a person who seems intoxicated. (Jacobsen Dep. 44:9–19; 46:7–21, attached as Exhibit F to Plaintiff's Opposition to The Sports Authority's Motion.) However, Jacobsen also testified that The Sports Authority never instructed him to make physical observation of potential purchasers of firearms, never instructed him to ask certain questions of potential purchasers of firearms, and never tested him on his knowledge of State or federal regulations regarding the sale of firearms. (Jacobsen Dep. 45:2–5; 44:5–8; 43:19–22, attached as Exhibit F to Plaintiff's Opposition to The Sports Authority's Motion.)

court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so").[11]

## LONABAUGH FAMILY MEMBERS' MOTION FOR SUMMARY JUDGMENT

Finally, the Lonabaugh family members and Rene DeBosscher have moved to dismiss the Complaint against them for failure to state a claim upon which relief may be granted. These defendants argue that because plaintiff has alleged no special relationship between them and Scott Lonabaugh or between Cindy Nannay and movants, and because they are without expert qualifications, they cannot be held responsible for failing to warn, particularly when Cindy Nannay was fully informed of Scott Lonabaugh's dangerous propensities.

Plaintiff disagrees. Defendant Rene DeBosscher told investigators on the day of the incident that on August 12, 1996, he observed Scott Lonabaugh load a long bag, which DeBosscher believed contained a rifle or shotgun, into his car and drive away. (Statement of Rene DeBosscher, Gloucester County Prosecutor's Office Event Report, attached as Exhibit A to Plaintiff's Opposition to The Sports Authority's Motion, p. 5.) Plaintiff claims that, particularly with regard to this defendant, there was knowledge of the risk of injury and imminent danger to Cindy Nannay and this defendant was in a position to know or have reason to know from past experience that there was a likelihood of conduct on the part of Scott Lonabaugh that would endanger the safety of Cindy Nannay. Plaintiff further contends that a special relationship existed between Cindy Nannay and the movants because Cindy Nannay resided in the house of Rene De-

Bosscher and Sara Lonabaugh and essentially was a member of the family.

Again, the claim asserted against the family members is one of negligence and turns on whether there existed a duty of care. But as stated above, where there are both federal and state law claims and the federal claims are dismissed, the Court may also dismiss the state law claims on jurisdictional grounds, and in fact, the Court ordinarily should refrain from exercising pendent jurisdiction in the absence of extraordinary circumstances. *University of Maryland at Baltimore v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1540 (3d Cir.1993); *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 196 (3d Cir.1976). Because this Court has granted summary judgment on plaintiff's section 1983 claims and finding an absence of any "extraordinary circumstances," the Court will not exercise pendent jurisdiction over the state law claims in this case, including, as discussed above, the negligence claim asserted against The Sports Authority, and the negligence claim which is the subject of the Lonabaugh family members' motion, in addition to the negligence and wrongful death claims asserted against the State defendants.

## CONCLUSION

For the reasons discussed above, the Court will grant the State defendants' motion for summary judgment on all claims brought pursuant to 42 U.S.C. § 1983. There is no need to decide whether the potential issue of fact present in the case against The Sports Authority is of a material nature because, regardless of the outcome, the claim is one of negligence, and the Court will decline to assert supplemental jurisdiction over it and all remaining State law based claims.

An appropriate Order will issue.

---

11. The Court notes that, pursuant to 28 U.S.C. § 1367(d), "[t]he period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." *See Hedges v. Musco,* 204 F.3d 109, 123–24 (3d Cir.2000) (federal statute provides for tolling of state claim during period it was pending in federal court and for 30 days afterward).

ORDER

This matter having come before the Court on three separate motions for summary judgment; and

For the reasons expressed in the Opinion of this Court issued even date,

IT IS ORDERED on this day of June, 2000 that the motion of defendants the State of New Jersey, Rowan College, Kevin Mannix, Pearl Bartelt, and Frank Hogan [57] is *GRANTED IN PART,* and all claims asserted against these defendants based upon 42 U.S.C. § 1983 are hereby dismissed.

Because these were the only federal claims asserted, the remaining claims against all remaining defendants are based solely in State law, and this Court will decline to assert jurisdiction over them; therefore,

IT IS FURTHER ORDERED that the remaining claims are *DISMISSED WITHOUT PREJUDICE* pursuant to 28 U.S.C. § 1367(c)(3), and, as a result, the other two motions filed [52, 62] are *DISMISSED AS MOOT,* and the case will be closed in this Court.